NOT DESIGNATED FOR PUBLICATION

No. 127,957

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of K.S., a Minor Child.

MEMORANDUM OPINION

Appeal from Atchison District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed April 11, 2025. Affirmed.

*Matthew R. Rich*, of Mears Hausmann, P.A., of Atchison, for appellant natural father.

*Kevin M. Hill*, assistant county attorney, for appellee.

Before MALONE, P.J., SCHROEDER and CLINE, JJ.

PER CURIAM: Father appeals the termination of his right to parent K.S. He argues there was insufficient evidence to support the district court's findings of unfitness and its finding that his unfitness was based on conduct or conditions unlikely to change in the foreseeable future. He also argues the court abused its discretion in finding that termination was in K.S.'s best interests. But after reviewing the record, we find no reversible error and affirm the court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On April 27, 2022, the State of Kansas petitioned the Atchison County District Court to find K.S., a minor child born in 2010, was a child in need of care (CINC). It contended that K.S. was without adequate parental control and the condition was not due solely to the lack of financial means of the parents; that K.S. was without the care and

1

control necessary for K.S.'s physical, mental, or emotional health; and that K.S. was not attending school as required by Kansas law after accumulating eight unexcused absences.

On September 16, 2022, the State amended its CINC petition to add allegations regarding Mother's continued substance abuse and her failure to participate in outpatient substance abuse treatment. The amended petition noted Father was incarcerated at Atchison County Jail. That same day, the district court issued an ex parte order of protective custody placing K.S. in the custody of the Kansas Department for Children and Families and an order removing K.S. from parental custody. The court appointed counsel for each parent.

Two months later, the district court adjudicated K.S. as a child in need of care after finding he was without adequate parental care, control, or subsistence and the condition was not due solely to the lack of financial means of the child's parents or other custodian, as defined by K.S.A. 38-2202(d)(1); was also without the care or control necessary for the child's physical, mental, or emotional health, as defined by K.S.A. 38-2202(d)(2); and was not attending school, as defined by K.S.A. 38-2202(d)(6). Father entered a no-contest statement to the allegations in the petition.

On October 6, 2023, the State of Kansas moved to find Mother and Father unfit to properly care for K.S. and sought to terminate their parental rights. In December, the district court held an evidentiary hearing on the State's motion. At the hearing, Father testified that Mother had primary custody of K.S. since birth. Father stated he tried to be involved in K.S.'s life but it was difficult because he claimed family members were getting "in the middle of" his and Mother's parenting, and as a result, Mother and Father separated. Father said he tried to call Mother to talk to K.S., but she would not answer because she "had a lot going on." He stated that if he was getting along with Mother, he would see K.S. all the time but would go months at a time without seeing him if his relationship with Mother was bad.

Around 2019, Mother, K.S., and Mother's family moved to Tennessee. Although Mother was there for a few years, Father maintained that he moved with them and left after about a month because of frequent family arguments and "verbal aggression almost every day." Father testified that after he moved to Atchison, he got into legal trouble and was incarcerated from April 2021 until March 29, 2022. He was arrested again in July 2022 and sent back to jail, where he remained throughout the case. He did not try to contact K.S. once he was released from jail in March 2022 and before he was arrested in July 2022.

During his incarceration, Father had no contact with K.S. until right before the evidentiary hearing, when he sent K.S. some letters. Father claimed he tried to call Mother a few times, but she never answered. Father received a letter from K.S. in response to his letters, which Father admitted as an exhibit at the hearing. In the letter, K.S. told Father he "was very su[r]prised to hear you were sending me notes" and noted he forgave Father "and would give [him] a second chance at being [his] father."

Father anticipated his release date to be March 2024. Although he did not have a job lined up or anywhere to go upon his release, he claimed he had filled out an application for the Oxford House in Lawrence to "rehabilitate and to get a head start on everything."

Father admitted at the hearing that he had received six write-ups while incarcerated for various infractions. But he also tried to improve himself by attending AA meetings, attending NA meetings, and completing substance abuse and anger management courses.

K.S.'s maternal grandmother (Grandmother) testified as well. She told the district court that K.S. had lived with her off and on basically his whole life. When K.S. lived with Grandmother, K.S. had no contact with Father. During that time, Father never called

3

or sent mail or presents to K.S., nor did he ever financially support K.S. She did acknowledge, however, that Father sent K.S. a letter about a month before the evidentiary hearing. One of Father's caseworkers also testified. She described her attempts to work with Father once she took over the case from his prior caseworker but admitted it was difficult since Father had been transferred around to several facilities while incarcerated.

At the conclusion of the testimony, the district court took the matter under advisement and scheduled a hearing in January 2024 to announce its decision.

When the district court reconvened in January, it explained why it was terminating Father's parental rights. It found Grandmother's testimony was credible, and Father's was partially credible. More precisely, it found Grandmother's specifics "related to the information regarding Tennessee" to be credible as opposed to Father's testimony.

The district court found that Father was presently unfit to be K.S.'s parent based on several statutory factors of unfitness under K.S.A. 38-2269, including:

- K.S.A. 38-2269(b)(4): Based on the evidence presented, Father neglected K.S. throughout this case and before.
- K.S.A. 38-2269(b)(7): The district court found public and private agencies made a reasonable effort to rehabilitate the family and failed. Although Father was incarcerated and was unable to fully participate in the reintegration plan, the court found that "incarceration was a result of his choices."
- K.S.A. 38-2269(b)(8): Father lacked effort to adjust to his circumstances, conduct, or conditions to meet the needs of K.S. because he had a "history of certain conduct and action and that has continued up to the point really right after the filing of this case but before this child was put into custody, and that there— even after he has been in DOC [Kansas Department of Corrections] custody, he's continued to have disciplinary . . . incidents within DOC."

4

- K.S.A. 38-2269(b)(9): "[T]he child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

- K.S.A. 38-2269(c)(2): Although Father sent three letters to K.S., he nevertheless "extensive[ly]" failed to maintain regular visitation, contact, or communication with K.S. or with the custodian of K.S. "during this case and before." The district court believed K.S.'s reaction to receiving the letter was "very telling."

- K.S.A. 38-2269(c)(3): Father failed to carry out his reintegration plan because he was incarcerated. The district court assumed that even if Father completed the substance abuse and anger management classes, there were several reintegration tasks that remained "due and outstanding."

The district court also found one statutory presumption of unfitness was met by clear and convincing evidence:

- K.S.A. 38-2271(a)(2): Father had at least twice been convicted of a crime in chapter 21 of the Kansas Statutes Annotated.

The district court next turned to whether Father's unfitness was unlikely to change in the foreseeable future. It noted that simply because Father was in custody, that did not mean his unfitness could not be changed in the future. But because of Father's criminal activity, his disciplinary complaints, his history of the lack of contact with K.S., as well as the other findings, the court determined Father's unfitness was unlikely to change in the foreseeable future.

Lastly, the district court determined the best interests of K.S. It found that because K.S. "is in a stable placement," Father's "amount of time . . . in DOC custody . . . [and] the lack of progress . . . made towards reintegration thus far while he has been in DOC

custody" was persuasive. It found it was in K.S.'s best interests to terminate Father's parental rights.

Father appeals this decision.

## REVIEW OF FATHER'S APPELLATE CHALLENGES

Father argues the district court erred in terminating his parental rights and believes the State failed to prove by clear and convincing evidence that he was unfit and his conduct or condition was unlikely to change in the foreseeable future. He also denies that it is in the best interests of K.S. for his rights to be terminated.

### *Standard of Review and Basic Legal Principles*

Parents who have undertaken the responsibility to raise children have a constitutional right under the federal and state Constitutions to continue to raise those children. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). To sever this right, the district court must first render an adjudication that the child is in need of care and then establish by clear and convincing evidence that the parent is "unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a); see *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). The State bears the burden to prove both that the parent is unfit at the time of the request to terminate parental rights and that the unfitness is unlikely to change in the foreseeable future. *In re L.D.B.*, 20 Kan. App. 2d 643, 646, 891 P.2d 468 (1995); see K.S.A. 38-2269(a).

K.S.A. 38-2269(b) lists nine nonexclusive factors the district court shall consider in determining unfitness. The district court must also consider a separate list of four nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 38-2269(c). Any one of the factors in K.S.A. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(f). The district court may also rely on 1 or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 38-2271(a).

Once a court finds a parent unfit, it must then consider whether termination of parental rights is in the best interests of the child. K.S.A. 38-2269(g)(1). In its deliberation, the court must give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would best be served by termination, the court must so order. K.S.A. 38-2269(g)(1). While the district court's unfitness finding must be supported by clear and convincing evidence, the best-interests determination is made on a preponderance of the evidence. "This is because the analysis of a parent's unfitness determines the constitutional question of whether a parent's rights *can* be terminated, and the analysis of the child's best interests determines whether a parent's rights *should* be terminated." *In re E.L.*, 61 Kan. App. 2d 311, 330, 502 P.3d 1049 (2021).

On appeal, we must be convinced, after reviewing all the evidence in the light most favorable to the prevailing party, the district court's fact-findings are highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

Appellate courts review the best-interests determination for abuse of discretion because the district court is in a better position to view the complexities of the situation.

7

The district court abuses its discretion if no reasonable person would agree with the court or the court made a factual or legal error. *In re E.L.*, 61 Kan. App. 2d at 330.

*Unfitness*

    1. *K.S.A. 38-2269(b)(4)*

The district court found Father unfit under K.S.A. 38-2269(b)(4) which directs courts to consider the "physical, mental or emotional abuse or neglect or sexual abuse of a child." It believed Father neglected K.S. throughout this case. Father argues on appeal that the court erred for two reasons. First, he asserts that he could not care for K.S. during the case because he was incarcerated. He believes he "did the best he could by holding a job, participating in programs and writing letters." Second, Father maintains he did not neglect K.S. before the case because when he tried to be a part of K.S.'s life, "those efforts were often thwarted by [Mother] and her family."

To begin, Grandmother's testimony—which the district court found was credible—supports the conclusion that Father neglected K.S. before and after the case. According to her, K.S. had been with her essentially since he was born and during that time, Father never had any contact with or financially supported K.S. until the letter he sent about a month before the hearing. And Father also admitted he had no contact with K.S. the entire time he was incarcerated, until the letters he sent to K.S. before the hearing. In the aggregate, this evidence shows Father neglected K.S. by failing to develop any long-lasting relationship with him.

Father nevertheless believes that there was no opportunity for him to form a relationship with K.S. because it was "thwarted by [Mother] and her family." But Father cites no testimony or other evidence to support this assertion on appeal, and the district court found Grandmother's testimony about Father's efforts to parent K.S. to be more

credible than Father's. Grandmother testified that Father had no contact with K.S. while they were in Tennessee and in fact, Father never moved to Tennessee with the family, nor did she have any interactions with Father in Tennessee. We cannot reweigh the credibility of these witnesses.

Even if Father's testimony is to be believed, Father had other avenues to create and foster a relationship with K.S. For instance, Father could have talked to Mother in person about scheduling phone calls or time with K.S. Father could have written letters to K.S. well before he did, sent him a present, or financially supported K.S. And perhaps most importantly, if Father believed his parental rights were being unlawfully infringed by Mother, he could have pursued a legal remedy. Father's three letters sent shortly before the termination hearing, while a positive step, cannot overcome years of neglecting K.S. The testimony showed that Father had a minor role in K.S.'s life and little contact with him.

Father also maintains he did not neglect K.S. while in prison because he "did the best he could by holding a job, participating in programs and writing letters." But he fails to explain how holding a job or participating in programs shows he did not neglect K.S. His testimony does not show, for instance, that he used any funds received from working the job to help pay for child support nor does it show that he believed his job fostered a relationship with K.S. in any way. Similarly, Father does not explain why he made no effort to contact K.S. until shortly before the hearing. Based on this record, we find clear and convincing evidence supports the court's finding that Father neglected K.S. and was therefore unfit under K.S.A. 38-2269(b)(4).

2. *K.S.A. 38-2269(b)(8)*

The district court also found Father unfit under K.S.A. 38-2269(b)(8) which directs courts to consider "lack of effort on the part of the parent to adjust the parent's

circumstances, conduct or conditions to meet the needs of the child." It based this decision on Father's actions before and during the case. Specifically, the court noted Father's conduct had not changed, given his criminal history before the case (which included convictions for battery and criminal threat) and his multiple disciplinary incidents during his incarceration. It believed he failed to adjust his circumstances, conduct, or condition to meet the needs of K.S.

Father counters on appeal that he adjusted to K.S.'s needs as much as possible while being incarcerated. To substantiate this conclusion, Father again points out that he worked a job and participated in anger management and drug and alcohol rehabilitation programs while incarcerated. While Father did make positive changes in his life, he continued to struggle with remaining law-abiding. While incarcerated, he received six write-ups for various infractions. He was written up for threatening or intimidating a person in March 2023; improper use of food in October 2023; violation of orders on November 15, 2023; violation of published orders on November 30, 2023; and twice being in a restricted area on November 15, 2023, and November 30, 2023. All but one or two of these infractions occurred after the State moved to terminate his parental rights.

In *In re M.H.*, 50 Kan. App. 2d 1162, 1173, 337 P.3d 711 (2014), this court examined how disciplinary violations can affect an analysis under K.S.A. 38-2269(b)(8). There, the father argued that "by completing inpatient drug treatment, by cooperating with the agency, by having clean drug tests, and by making arrangements for his ex-wife to assume custody of [the child]," he adjusted his circumstances, conduct, or conditions to meet the needs of the child. *In re M.H.*, 50 Kan. App. 2d at 1173. Yet this court explained:

> "While in prison, Father incurred numerous disciplinary violations, some of them serious. Had Father not violated prison rules on so many occasions, he could have been released from prison earlier, at which point reintegration with M.H. would have been more likely.

Though we appreciate the progress Father did make toward changing his life, a reasonable factfinder could have found it highly probable that Father did not change his circumstances to better meet M.H.'s needs and would be unlikely to do so in the foreseeable future viewed from M.H.'s perspective." *In re M.H.*, 50 Kan. App. 2d at 1173-74.

And in *In re T.H.*, 60 Kan. App. 2d 536, 540, 494 P.3d 851 (2021), the father pled guilty to two counts of distribution of methamphetamine and was sentenced to prison. The State filed a motion to terminate his parental rights because of the father's inability to care for the child due to incarceration. 60 Kan. App. 2d at 542. But the record showed that when the father was incarcerated, he completed all reintegration plan tasks that he could complete; had no disciplinary action in prison; no negative law enforcement contact; earned 64 days of good-time credit; held a job in the kitchen at the prison; and maintained contact with the child almost every weekend. 60 Kan. App. 2d at 541. Although the father was incarcerated and could not parent the child in person, this court found it persuasive that he went "to great lengths to make amends for his crime, remain drug free, and be free of disciplinary complaints in prison." 60 Kan. App. 2d at 557. Additionally, the father had a substantial relationship with the child before incarceration, earned and saved money for the child, and possessed a car and a house to reside in upon his release. 60 Kan. App. 2d at 541.

Like the father in *In re T.H.*, Father also maintained a job while incarcerated and according to him, completed substance abuse and anger management programs. Although Father succeeded in some areas, his continued disciplinary violations while incarcerated shows that Father could not or would not adjust his conduct to meet K.S.'s needs. He continued to make bad choices rather than focusing on improving his behavior, developing a relationship with K.S., earning good-time credits which may allow his early release, and prepare for reintegration with K.S. upon release. The district court found Father's failure to improve his conduct outweighed the successes, and Father is asking that we reweigh the same evidence evaluated by the district court. We do not reweigh

11

conflicting evidence or reassess the credibility of witnesses; instead, we rely on the fact-finder—who was present to observe the witnesses' demeanor and hear their testimony—for those judgments. *In re D.J.B.*, No. 122,333, 2020 WL 4032849, at *4 (Kan. App. 2020) (unpublished opinion); see *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Based on this record, we also find clear and convincing evidence supports the court's finding that Father did not change his conduct to better meet K.S.'s needs due to his many disciplinary violations and was therefore unfit under K.S.A. 38-2269(b)(8).

3. *K.S.A. 38-2271(a)(2)*

The district court also found Father unfit under K.S.A. 38-2271(a)(2), which directs courts to presume a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the State established by clear and convincing evidence that

> "a parent has twice before been convicted of a crime specified in article 34, 35, or
> 36 of chapter 21 of the Kansas Statutes Annotated, prior to their repeal, or articles 54, 55
> or 56 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 21-6104, 21-6325, 21-
> 6326 or 21-6418 through 21-6421, and amendments thereto, or comparable offenses
> under the laws of another jurisdiction, or an attempt or attempts to commit such crimes
> and the victim was under the age of 18 years." K.S.A. 38-2271(a)(2).

Father concedes the district court correctly found that he is presumed unfit under this statute. He has the burden to rebut this presumption of unfitness by a preponderance of the evidence. K.S.A. 38-2271(b). But he does not provide an argument under this section in his brief on how he rebuts this presumption. Rather, it appears that later in his brief, he groups this argument in with his foreseeability argument. We therefore will address his argument on this statutory basis when we address his foreseeability argument.

12

### 4. *Other Statutory Factors*

While the district court relied on other statutory factors to find Father was unfit to parent K.S.—which Father challenges—we need not address those factors because even "when the district court relies on multiple statutory factors in finding parental unfitness, we will affirm so long as clear and convincing evidence supports a finding of unfitness based on one of those factors." *In re E.L.*, 61 Kan. App. 2d at 323. Therefore we affirm the court's finding of unfitness based on K.S.A. 38-2269(b)(4), K.S.A. 38-2269(b)(8), and K.S.A. 38-2271(a)(2), although any one of those factors would support the finding.

### *Foreseeability*

We now turn to whether the State proved that Father's circumstances are "unlikely to change in the foreseeable future." See K.S.A. 38-2269(a). At the termination hearing, the district court found that although it considered Father's incarceration in its unfitness analysis, it concluded "that particular factor will change in the foreseeable future given that he's probably going to be out of DOC custody in 60 days or less." But the court still determined Father's unfitness was unlikely to change in the foreseeable future based on past conduct and past inaction.

Father contends that because he started recently communicating with K.S. and since K.S. seemed open to the communication, the district court should have allowed him an opportunity to rebuild his relationship with K.S. Father claims he had been making strides to improve himself while incarcerated and argues the district court should have given greater weight to his efforts to rehabilitate himself when determining whether he would be able to care for K.S. in the foreseeable future.

Given the totality of the circumstances, we find sufficient support for the district court's determination that Father's unfitness was unlikely to change in the foreseeable

13

future. It is true that Father wrote a few letters to K.S. right before the evidentiary hearing and seemed to be making positive strides in his life. That said, the district court rightfully seemed concerned with the permanency of these efforts and reliability of Father's intentions, given that he did not act on those intentions in the past. The court pointed out that Father expressed there were many times he wanted more contact with K.S. or could not make contact because Mother had custody, but he did not pursue legal options to make contact. A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); see also *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion) ("Parental unfitness can be judicially predicted from a parent's past history."). And Father's repeated disciplinary violations while incarcerated demonstrate there is real uncertainty about his ability to make lasting changes in his life and behavior.

Father acknowledges that children and adults have different perceptions of time and a child has the right to permanency within a time frame that is reasonable to them. While Father wants more time to improve his life and ability to care for K.S., K.S. has already waited considerable time for Father to do just that. K.S. is a teenager and has spent most of his life without much contact with Father.

Father's future postincarceration is also a concern. Although he filled out an application to go to the Oxford House in Lawrence to rehabilitate, he stated he had not heard back from them. He further noted he had no job lined up postincarceration and did not have anywhere to go. As the court noted, if Father had nowhere to go upon release, his ability to effectively reintegrate with K.S. was questionable.

We are not persuaded by Father's arguments. Instead, we are convinced the district court evaluated all the testimony and evidence before determining it could not rely on Father's behavior to change given his past conduct and continued disciplinary violations. On balance, Father has had little to no contact with K.S. during K.S.'s lifetime and Father

14

had no capabilities to care for K.S. once released from incarceration. Father's past actions and the uncertainty of his future behavior and plans demonstrate his circumstances are unlikely to change in the foreseeable future.

We therefore also affirm the district court's finding that Father's conduct or condition is unlikely to change in the foreseeable future.

*Best Interests*

The district court's best interests finding is governed by a less stringent standard of review than assessing the fitness of a parent. As directed by K.S.A. 38-2269(g)(1), the district court should give "primary consideration to the physical, mental and emotional health of the child" in making a best interests finding. A district court decides best interests based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). The decision largely rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1116. An appellate court reviews those sorts of conclusions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019).

Father asserts two arguments on appeal to contend the district court erred in finding it is in the best interests of K.S. to terminate Father's parental rights. First, he believes that "although [he] made choices which landed him in prison, he has worked to remedy those choices and put himself in a position to care for K.S. upon his release." Second, he maintains "K.S. expressed excitement upon receiving a letter from his father, which is evidence that there is still hope for a relationship."

15

His arguments are unpersuasive. To begin, Father has not pointed to any evidence which shows he remedied the choices that landed him in prison or that he has put himself in a position to care for K.S. upon release. Additionally, Father's letter to K.S. cannot serve as a foundation for a parental relationship with K.S. Father had minimal contact with K.S. throughout the child's life. A "parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing . . . . But we must judge these cases based mostly upon actions, not intentions." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008). Although Father's intention might be to begin a relationship with K.S., that does not mean it is in the best interests of K.S. for Father to keep his parental rights. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010), found:

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children."

K.S. has had permanence his entire life without living or largely communicating with Father. The bond between the two is not strong. When explaining its decision, the court found K.S.'s reaction when he finally received a letter from Father revealed a "significant depth of absence" and "a lot of mixed emotions." And it noted that K.S. thought Father did not want him and, at best, K.S. had intermittent contact with Father during his life.

It was reasonable for the court to be concerned that if Father's parental rights remain intact, that could cause more upheaval for K.S. given Father's history of minimal communication, recidivism, and significant disciplinary issues.

Based on this record, we also find no abuse of discretion in the district court's decision that it was in the best interests of K.S. to terminate Father's parental rights.

Affirmed.